## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| CAROL COTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:03-CV-468 PS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Carole L. Cote's application for judicial review of a final decision of the Defendant Commissioner of Social Security Administration ("SSA") finding that she was no longer entitled to Disability Insurance Benefits. Upon a close review of the record, the decision of the ALJ is affirmed.

## I. FACTUAL BACKGROUND

### A.    Procedural History

Cote was originally found to be disabled due to a seizure disorder and became entitled to disability benefits in 1983. (R. 15, 105). In 1986 and 1991, the SSA conducted continuing disability reviews to determine whether Cote had experienced medical improvement.    In 1986, Cote cited only her seizure disorder in support of her review. (R. 104). However, in 1991, Cote added "nervousness" to her report. (R. 114). Both the 1986 and 1991 reviews resulted in findings of continued disability. (R. 15). Cote's third continuing disability review commenced in October, 2000. (R. 15, 124-133). During this review the SSA determined that Cote's disability had ceased as of October 15, 2001 and that her cash benefit payments would be

- 1 -

discontinued as of December 31, 2001.  (R. 15, 82-84).  Upon reconsideration, a Disability

Hearing Officer also found that Cote was no longer disabled as of October 15, 2001.  (R. 15, 87-

101).

Cote contested the decisions and a hearing was held by ALJ William J. Wilkin on

February 24, 2003.  (R. 15-24, 102-103).  The ALJ heard testimony from Cote and vocational

expert Frank Mendick.  (R. 15-24).  Based on testimony at the hearing and Cote's submitted

medical evidence, the ALJ found that Cote experienced medical improvement related to her

ability to work, had the residual functional capacity for a range of light work, and could perform

jobs which existed in significant numbers in the national economy.  (*Id.*).  Accordingly, the ALJ

denied Cote's claim and found her not disabled in a decision dated April 14, 2003.  (*Id.*).  The

Appeals Council denied review, rendering the ALJ's decision the final decision of the

Commissioner.  (R. 4-7); 20 C.F.R. § 404.981.  Thereafter, Cote appealed the ALJ's decision in

this Court.

**B.      Cote's Physical Impairments**

Cote was 53 years old at the time of the hearing.  (R. 21, 32).  She has a twelfth grade

education.  (R. 21, 33).  Prior to Cote's disability onset date in 1982, her previous work

experience included employment as a bookkeeper and receptionist.  (R. 34-35).  Cote's alleged

impairments include a nervous disorder, an abnormal brain wave, and seizures.  (R. 124).

**1.      Cote's Treating Physicians**

Cote's records indicate that she was diagnosed with a seizure disorder in 1983.  (R. 161-

176).  Dr. Shahida Ahmad, Cote's current treating neurologist, first diagnosed Cote in 1986 with

Partial Complex Epilepsy and noted that Cote's seizures were without pattern or warning.  (R.

177, 179).  Dr. Ahmad concluded that Cote was unable to work because her seizures rendered

- 2 -

her unable to drive or work near moving vehicles, machinery, and fires.  (R. 178).

Cote submitted additional evidence regarding her seizures during the SSA's 1991 disability review.  During this review, Dr. Ahmad reported that Cote visited her every three months and had been hospitalized due to her seizures.  (R. 202).  Although Dr. Ahmad stated that Cote's seizures were relatively well-controlled, Cote still had no warning before the onset of a seizure, was unable to drive, take public transportation, or work near machinery.  (*Id*.).

For the review at issue in this appeal, Cote submitted Dr. Ahmad's treatment notes for the period of time between 1995 and 2001.  A common theme runs throughout those notes; there are no reports of seizures.  For example, the notes from the July 31, 2000 visit states that Cote reported "no seizure since last visit." (R. 265).  The doctor's notes from the previous visit on August 30, 1999 likewise state "no complaints.  No seizure since last visit."  (R. 266).  Six months earlier, on February 15, 1999, the doctor again noted that Cote was reporting "no seizure" since her prior visit.  (R. 267).  All the other progress notes taken by the doctor going back to February 9, 1995 say similar things: that Ms. Cote was not experiencing any seizures. (*See* R. 268 - 273).

On April 6, 2001 Dr. Ahmad completed a seizure questionnaire for the continuing disability review at issue in this appeal.  In the questionnaire, Dr. Ahmad indicated that Cote had not had any seizures in the past six months.  (R. 260).  Indeed, in response to a question about the frequency and pattern of the seizures, Dr. Ahmad reported  – consistent with what was being stated by Ms. Cote as reflected in the progress notes –  that the "seizures are controlled." (R. 260). Dr. Ahmad explained that the seizures were controlled with medication.  (R. 259-260). Cote's seizure medications include Tegretol and Primidone.  (R. 266).

Cote then submitted a follow up letter from Dr. Ahmad addressed to "to whom it may

- 3 -

concern" dated June 10, 2002.   This letter from Dr. Ahmad was inconsistent with what she had stated in the questionnaire a little more than a year earlier.   In contrast with the treatment notes and the April, 2001 questionnaire, on this occasion Dr. Ahmad stated that Cote had been suffering from partial complex seizures for years and was "unable to work at all as a result of the fact that she still gets transient auras. She is considered disabled as a result of this medical problem."   (R. 324).   An aura is a subjective sensation that often precedes an epileptic attack. DORLAND'S ILL. MEDICAL DICT. 168 (27th ed. 1988).   Transient merely means that the aura is short-lived or passing.

In February 2003, Dr. Ahmad completed yet another seizure questionnaire indicating Cote had partial complex seizures and anxiety.  (R. 336-340).   Dr. Ahmad reported that Cote had approximately one to three seizures per month.  (R. 337).   In the designated space to indicate the dates of Cote's last three seizures, Dr. Ahmad checked only the November box, leaving the others blank.  (*Id.*).   Dr. Ahmad submitted a revised questionnaire after the hearing in March 2003, with the boxes checked for December 2002 and January 2003 in addition to the November 2002 box checked earlier. (R. 344).   The questionnaires are otherwise identical. According to the revised questionnaire, when seizures did occur, they lasted a few seconds which was followed by confusion and irritability. (R. 337-38).   As a result, according to Dr. Ahmad, Cote was unable to drive except for short distances in cases of urgent need and was unable to work at heights or with machinery that required an alert worker.  (R. 338-39).   Dr. Ahmad also indicated that Cote suffered a variety of associated mental problems including depression, irritability, social isolation, poor self-esteem, and memory problems.  (R. 339).

With respect to her ability to work, Dr. Ahmad opined that Cote's seizures would likely disrupt co-workers and that she would need more supervision at work than an unimpaired

worker.  (*Id.*).  Because of her seizure disorder, Cote would likely need to lie down at unpredictable intervals during a work shift once to twice per week.  (*Id.*).  Dr. Ahmad also opined that Cote had a poor tolerance for stress and that simple workplace pressures would likely trigger a seizure.  (R. 340).  Dr. Ahmad still reported that Cote's medications controlled her seizures to a large degree.  We note that Cote did not provide any treatment notes from Dr. Ahmad for the time period between February 19, 2001 and February 2003.

      **2.**        **Physician Reviews**

In August of 2001, Dr. A. Lopez, responding to the SSA's request for medical advice, reviewed Cote's medical record and concluded that medical improvement had occurred, noting that "at least since 1995 her [treating physician] has stated client did not have seizures."  (R. 285).  Dr. Lopez concluded that Cote did not have any exertional limitations, but could never climb ladders, ropes or scaffolds and needed to avoid even moderate exposure to hazards such as machinery and heights.  (R. 282, 284).

Similarly, in March 2002, Dr. J. Sands reviewed Cote's medical record to complete a physical residual functional capacity assessment.  (R. 302-309).  While Dr. Sands did not opine on whether or not Cote had experienced medical improvement, Dr. Sands found that Cote did not have any exertional limitations other than heights and stated that Cote must avoid moderate exposure to machinery.  (R. 302-10).

C.    **Cote's Mental Impairments**

In addition to her physical impairments, Cote bases her entitlement to continued disability benefits on anxiety, stress, and general "nervousness."  As an initial matter, we note that Cote did not submit any records from any treating psychiatrists, psychologists, or therapists for treatment prior to 2002.   Further, while Cote claimed she suffered "nervousness" as part of her 1991 review, the record suggests that the 2001 review is the first time that Cote submitted evidence of mental impairments.

In August 2001, Dr. Patrick McKian, a clinical psychologist, examined Cote at the request of the SSA.  (R. 276-278).   Dr. McKian first noted that Cote had not received any previous psychiatric treatment with the exception of twenty years ago, and on that occasion it was only a one time evaluation with no medication having been prescribed and no follow-up therapy.  (R. 276).  During their session, Dr. McKian noted that Cote seemed highly anxious, observing Cote's physical shaking, difficulty concentrating, and fatigue during the interview.  Dr. McKian also noted that Cote had difficulty with memory and concentration.  (R. 277).   Dr. McKian concluded that in addition to Cote's seizure disorder, she suffered generalized anxiety disorder as a "rule out" diagnosis,[1] for which she had never been treated.  Dr. McKian also assessed Cote with a Global Assessment of Functioning ("GAF") score of 59.[2]  (R. 278).

---

[1]"Rule out diagnosis" refers to the medical diagnostic process of eliminating possible illnesses one at a time by revealing clinical information from history, examination or testing that is not consistent with the diagnosis being ruled out.  When all the other diagnoses in the differential diagnosis have been ruled out, the correct diagnosis is presumed to remain.  BehaveNet, *Clinical Capsules* (June 20, 2005) *available at* http://www.behavenet.com/capsules/diagnostic/ruleout.htm

[2]The GAF is a numeric scale (1-100) used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults.  DIAGNOSTIC AND STATISTIC MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).

Dr. Pressner, a state agency psychologist, reviewed Cote's record in September 2001. (R. 288-301).  Dr. Neville, also a state agency psychologist, reviewed the record evidence in March 2002.  (R. 310-323).  Both psychologists concluded that Cote did not have a severe mental impairment and indicated that Cote suffered only mild confusion.  (R. 300, 310).

Cote received some treatment for her mental impairments at the Tri-City Community Mental Health Center ("Tri-City") from July 2002 through March 2003.  (R. 349-369).   Cote appears to have been referred to Tri-City by her attorney and was examined and treated by social worker Ruth Dekker.  (R. 366-369).   Dekker's  diagnosis was similar to Dr. McKian's: generalized anxiety disorder and a depressive disorder with a GAF score of 58, meaning that Cote has mild to moderate symptoms.  (R. 362).

On January 15, 2003, Cote met with a psychiatrist at Tri-City.  (R. 333-334).  The psychiatrist diagnosed Cote with various mental impairments and assessed Cote with a GAF score of 55-60.  (*Id*.).  The records from both Dekker and the psychiatrist indicate that Cote's primary motivation for visiting the Center was to obtain support for continuing her disability benefits.  (R. 333, 352, 357, 364).  Dekker explained to Cote that the Center's function was to provide therapy and treatment, not to certify people for disability benefits.  (R. 357).  Dekker's notes reveal that Cote demonstrated no motivation in her treatment and had resistance to work on issues.  (R. 333).  The last documented visit to the Center was in February 2003 in which Cote met with Dekker.  (R. 349).  When asked about scheduling future visits, Cote indicated that she would call at a later date.   (*Id*.).  It appears as though Cote has not returned to the Center since February 2003, coincidentally the same month in which the ALJ conducted his hearing, now the subject of this review.

**D.    Hearing Testimony**

- 7 -

Cote testified at the February 24, 2003 hearing regarding her seizure disorder, her anxiety, and her day-to-day activities. The hearing transcript clearly reveals that Cote was nervous during the hearing and likely had difficulty concentrating based on the lapses in her testimony and prompts by both the ALJ and her lawyer. Cote indicated that she had most recently suffered a seizure a few weeks before the hearing, approximately around Valentine's Day. (R. 40). Cote was unable to state how frequently she suffers seizures, but stated that she met with Dr. Ahmad every two months. (R. 38-40, 59-60). Cote stated that her hand shakes, she suffers from forgetfulness, anxiety and nervousness, often feels fatigued, has had problems with depression, and has difficulty dealing with stress – a difficulty that increases when she has to be somewhere at a specific time. (R. 54-56, 60-62). When asked how much she could lift, Cote testified that she was unable to lift "a whole lot," but estimated that she could lift approximately five pounds. (R. 53-54). Cote testified that she is able to drive short distances, mostly to the store, can care for herself, and can perform light housework such as cooking, cleaning and other household chores. (R. 43-44). Cote further testified that she attends church most Sundays and enjoys singing in the church choir. (R. 45, 50-52). In the past, she enjoyed bowling competitively on a local league team, but quit approximately one year ago. (R. 49-50).

Frank Mendrick, a certified rehabilitation counselor and vocational expert ("VE") testified regarding Cote's ability to work. (R. 69-78). Mendrick testified that Cote has no transferable skills from her past work experience in 1982. (R. 70-72). However, Mendrick testified that a hypothetical individual of Cote's age, education, and work experience, who was limited to light exertional work that did not involve work around heights or moving machinery and only simple one and two step jobs that required a very low degree of concentration, would be able to perform unskilled jobs such as general assembly, inspection, and hand-packing. (R.

- 8 -

71-72).  Mendrick further testified that in a six county area, which includes the Chicago

metropolitan area plus Lake and Porter Counties in Indiana, there are approximately 8,000

assembly jobs, 3,000 to 4,000 inspection jobs, and over 10,000 hand packing jobs. (R. 72).  For a

sedentary individual with no transferable skills, Mendrick testified that there are approximately

2,500 assembly jobs, 1,000 inspection jobs, and about 800 packing jobs in the same area.  (R. 72-

73).

**E.     ALJ's Findings**

        Upon consideration of the hearing testimony and record evidence, the ALJ issued a 10-

page order concluding that Ms. Cote was no longer disabled within the meaning of the Social

Security Act. The ALJ arrived at that conclusion after applying the eight- step analysis required

for determining if an applicant's disability continues. (R. 17-18);  *See* 20 C.F.R. § 404.1594.

The ALJ found that Cote was no longer disabled after taking into consideration both her seizure

disorder and her mental impairment.  The ALJ questioned the evidence submitted by Dr. Ahmad

(the treating neurologist) given the discrepancy between her treatment notes – which repeatedly

reflected no seizures being reported – with the questionnaires she completed which stated the

contrary.  (R. 19).  The ALJ also found that, although Cote was generally credible, he found that

she had a poor memory relating to when she experienced seizures, (R. 19), and also found that

there was a  "gap in [her] credibility" with respect to her ability to perform work-related tasks.

Based upon these finding, the ALJ determined that Cote ceased to be disabled on October 15,

2001, and that her entitlement to disability benefits ended on the last day of December 2001.  (R.

22-23).

**II.  DISCUSSION**

- 9 -

Cote outlines four arguments in her appeal of the ALJ's decision.  First, Cote asserts that the ALJ improperly dismissed evidence of Cote's mental impairment.  Second, Cote asserts that the ALJ improperly found Cote not to be credible.  Third, Cote asserts that the ALJ's finding that Cote can perform a significant range of light work is not supported by substantial evidence. Finally, Cote asserts that the ALJ failed to follow the regulations regarding Cote's age.  Cote's first and third arguments relate to the application of the continuing review standard.  Thus, we take these arguments together in our review of the ALJ's decision.  Thereafter, we address Cote's second and fourth arguments.

A.      **Standard of Review**

Section 205(g) of the Social Security Act limits the scope of judicial review of the Commissioner's final decision by providing that "any fact, if supported by substantial evidence, shall be conclusive," and, thus, the court's power to modify, affirm, or reverse the decision of the Commission is restricted.  42 U.S.C. § 405(g).  Accordingly, we review the Commissioner of Social Security Administration's decision to deny benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Because the review of the ALJ's findings is deferential, we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] own judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539.  As the Court stated in *Rice*, "while the ALJ must have built a logical bridge from the evidence to his conclusion, we will nonetheless give the opinion a commonsensical reading rather than nitpicking at it." *Rice*, 384 F.3d at 369 (internal citations and quotations omitted).

- 10 -

Continued eligibility for disability benefits requires the claimant to bear the "continuing burden of showing, by means of medically acceptable techniques that his impairment is of such severity" as to render him unable to perform his previous work or any other kind of gainful work. *Mathews v. Eldridge*, 424 U.S. 319, 336 (1976) (internal citations omitted); 42 U.S.C. § 423(f). If upon review substantial evidence demonstrates that "there has been medical improvement in the [claimant's] impairment or combination of impairments (other than medical improvement which is not related to the [claimant's] ability to work), and the [claimant] is now able to engage in substantial gainful activity," termination of disability benefits is appropriate. 42 U.S.C. § 423(f).

**B.      The ALJ's Continuing Disability Review**

As an initial matter, we note that the parties have applied different tests to determine if Cote is eligible for Social Security Disability. Cote claims that the five-step test set forth in 20 C.R.F. § 1520 is the correct method while the SSA utilizes the eight-step test set forth in 20 C.FR. § 404.1594. The SSA is correct. The five step test that Cote repeatedly discusses in her brief is the test used by the SSA for an initial determination of disability. In contrast, 20 C.F.R. § 404.1594(f) specifically details an eight-step evaluation in determining eligibility for continuing disability. S*ee, e.g., Dixon v. Barnhart,* 324 F.3d 997, 1000 (8th Cir. 2003); *Mables v. Sullivan*, 812 F. Supp. 886, 891 (C.D. Ill. 1993). Therefore, the ALJ correctly employed the eight-step test set forth in 20 C.F.R. § 404.1594(f).

Under the eight step test the Commissioner must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is

related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work. 20 C.F.R. § 404.1594(f); *Dixon*, 324 F.3d at 1000-01.

In this case, since Step 1 was not in dispute, the ALJ moved quickly to Step 2 and reviewed the evidence to determine whether the claimant's current impairments meet or equal the severity level of the impairments listed in Appendix 1 to the Act.   (R.18-19).  Appendix 1 contains a list of mental impairments and describes what must exist to support a finding of a "severe impairment." A finding of severe impairment at this step is akin to a finding of "*per se* disability." *Mables*, 812 F. Supp. at 891.  That is, if the ALJ were to find that Cote's impairments, alone or in combination, met any one of the listings in Appendix 1, his analysis would cease and Cote's benefits would continue.

Here, the ALJ considered both Cote's epilepsy (i.e her seizure disorder) and her anxiety and found that they do not meet or equal the severity of listed impairments.  The ALJ's findings are supported by substantial evidence.

### ALJ's Step 2 Evaluation of Cote's Physical Disorder

Section 11.02 and 11.03 of Appendix 1 describe severe epilepsy as a listed impairment. They provide:

> 11.02 Epilepsy – convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.
>
> 11.03 Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02., 11.03.

Here, Cote does not contend that the ALJ failed to consider her epilepsy. Instead, she claims that the ALJ improperly disregarded evidence submitted by her treating physician – evidence that she claims is controlling in this analysis.

20 C.F.R. § 404.1527 explains how the ALJ is to evaluate medical opinion evidence. Sensibly, this section does state that more weight is given to opinions from a treating source, and that opinion, if well-supported by medically acceptable clinical and laboratory diagnostic techniques, may be given controlling weight. 20 C.F.R. § 404.1527(d)(2). However, the section also explains that where a treating physician's opinion is inconsistent with her own records or with other source's opinions, the ALJ has the responsibility to review all of the evidence and make the appropriate findings of fact. 20 C.F.R. § 404.1527(f). Further, state agency medical consultants are regarded by the SSA as highly qualified physicians and psychologists who are experts in Social Security disability evaluation. *Id.*

- 13 -

Here, the ALJ specifically referred to Dr. Ahmad's opinion in his decision. The ALJ did not reject the treating physician's opinions based only on the non-examining physicians opinions, although that was part of it. Rather, the ALJ looked askance at Dr. Ahmad's opinions because they were inconsistent with her own treatment notes. Dr. Ahmad initially stated that Cote had no seizures as of April 2001. This is in accordance with the treatment records that span seven years. However, sometime in 2002, Dr. Ahmad wrote a letter indicated that Cote had suffered seizures "for years." Finally, in 2003, Dr. Ahmad reported that Cote suffered one to three seizures per month – initially indicating that the last seizure occurred in November 2002, but later amending the report to include seizures in December and January. Cote did not submit treatment notes with these later questionnaires.

Cote relies on *Gudgel v. Barnhart*, 345 F.3d 467 (7th Cir. 2003), in support of her argument that ALJ's did not give enough deference to the treating physician's evidence. *Gudgel* teaches that an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Id*. at 470. In this case, the ALJ did not merely reject the opinion of Dr. Ahmad in favor of the non-treating physicians. Instead, the ALJ found that Dr. Ahmad's recent description of the severity of Cote's seizures (as reflected in the multiple questionnaires that she filled out), did "not correspond with the statements contained in the treatment notes." (R. 19). Thus, the ALJ rejected Dr. Ahmad's opinions not based on the testimony of a non-treating physician alone but on Dr. Ahmad's own contradictory progress notes, and this is consistent with *Gudgel.*

Lastly, we note that Dr. Ahmad's passing reference to "transient auras" does not save the day for Cote as a "transient" aura is not part of the description of epilepsy set forth in Appendix

- 14 -

1.  Accordingly, the ALJ's finding that Cote did not meet a listed impairment for purposes of *per se* disability in Step 2 is supported by substantial evidence.

### ALJ's Findings on Cote's Mental Impairments

With respect to Cote's claims of mental impairment, at Step 2 the ALJ specifically considered both her depression and her anxiety.  He properly cited Sections 112.04 and 112.06 of Appendix 1 as guiding his analysis. (R. 19). Section 112.04 deals with mood disorders including depression.  For qualification as "severe" in adults, Section 112.04 requires:

> Medically documented persistence, either continuous or intermittent, of one of the following:
>
> > a. Depressed or irritable mood; or
> >
> > b.  Marked diminished interest or pleasure in almost all activities; or
> >
> > c.  Appetite or weight increase or decrease, or failure to make expected weight gains; or
> >
> > d.  Sleep disturbance; or
> >
> > e.  Psychomotor agitation or retardation; or
> >
> > f.  Fatigue or loss of energy; or
> >
> > g.  Feelings of worthlessness or guilt; or
> >
> > h.  Difficulty in thinking or concentrating; or
> >
> > I.  Suicidal thoughts or acts; or
> >
> > j.  Hallucinations, delusions, or paranoid thinking.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 122.04.   Section 112.06 deals with anxiety and requires medical documentation of at least one of the following for a "severe" finding in an adult:

> A.  Medically documented findings of at least one of the following:

- 15 -

1.  Excessive anxiety manifested when the child is separated, or separation is threatened, from a parent or parent surrogate; or

2.  Excessive and persistent avoidance of strangers; or

3.  Persistent unrealistic or excessive anxiety and worry (apprehensive expectations), accompanied by motor tension, autonomic hyperactivity, or vigilance and scanning; or

4. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

5. Recurred severe panic attacks, manifested by a sudden unpredictable onset of intense apprehension, fear, or terror, often with a sense of impending doom, occurring on the average of at least once a week; or

6. Recurrent obsessions or compulsions which are a source of marked distress; or

7. Recurrent and intrusive recollections of a traumatic experience, including dreams which are a source of marked distress

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 122.06.

The ALJ cited several sources in support of his conclusion that Cote's depression and anxiety were not severe for purposes of Step 2.  First, he cited the August 2001 and March 2002 psychologist reports both of which conclude that Cote's mental impairments are not severe and do not place any restrictions on Cote's activities of daily living.  (R. 19).  He also noted that both reviews indicate that Cote's difficulties maintaining concentration, persistence, or pace are merely mild.  (*Id*.).   Second, the ALJ noted that there was no evidence of an increase in the severity of Cote's mental impairment since the date of her last review.  Finally, the ALJ noted that the records from Tri-City show that while Cote was diagnosed with a generalized anxiety disorder, both the social worker and the psychiatrist who examined Cote came to the conclusion that Cote was more interested in simply continuing her disability as opposed to actually getting treatment.

Thus, we find that the ALJ's decision at Step 2 – both with respect to Cote's physical disorder and her mental disorder – was supported by substantial evidence.

At Step 3, the ALJ was required to determine if Cote experienced medical improvement in her seizure disorder – the disorder which qualified her for disability during her last review. (R. 19).  In finding that she had, the ALJ once again cited to Dr. Ahmad's treatments notes indicating that Cote had not suffered seizures for a number of years (with the exception of the relatively mild "transient auras").  The ALJ thus concluded that Cote experienced medical improvement in her seizure disorder such that she was "no longer meets or equals the severity levels" in Section 11.02A of Appendix 1.  (R. 19).  A review of Dr. Ahmad's treatment notes supports this conclusion.  (R. 268-273).  Thus,  the ALJ's Step 3 analysis is supported by substantial evidence.

At Step 4, the ALJ found that Cote's medical improvement related to her ability to work. He found that Cote experienced both a decrease in the severity of her impairment and a corresponding increase in her ability to perform basic work.  (R. 20).  As to the former, there was substantial evidence to support this from the consulting doctors and from a review of Dr. Ahmad's treatment notes of Cote as detailed above.  As for the latter – the increase in her functional capacity – the ALJ noted that as of the date of Cote's initial cessation, she "possessed the functional capacity to perform basic work activities, including exertional activities such as standing, walking, pushing, pulling, and reaching and carrying" as well as non-exertional activities such as "seeing, hearing, speaking, remembering, and dealing with others."  (R. 20).

These findings are supported by substantial evidence.  Cote testified that she cares for herself (R. 43); brings herself to the doctor (R. 44); drives (R. 44); takes public transportation (R. 45); goes to church (R. 45); sings in the church choir (R. 51); rehearses weekly with the choir (R.

51); sweeps and dusts her home (R. 47); walks up and down steps (R. 48); bowled weekly in a

league in the year prior to the hearing (R. 49-50); lifts bags of groceries (R. 53); has full use of

her hands and legs (R. 53); and can see and hear without difficulty (R. 54). There was thus

substantial evidence to support the ALJ's findings concerning medical improvement.

Under the Step 6 analysis (Step 5 was immaterial in this case), the ALJ had to next

determine whether all of Cote's current impairments, in combination, are severe.   Here, the ALJ

found:

> "The medical evidence indicates that the claimant has anxiety and a
> seizure disorder, impairments that are severe within the meaning of
> the Regulations but not severe enough to meet or medically equal one
> of the impairments listed in Appendix 1 . . . Since the claimant has at
> least one medically determinable severe impairment, I must therefore
> determine whether she retains the residual functional capacity to
> perform the requirements of . . . work existing in significant numbers
> in the national economy."

(R. 20).   In other words, the ALJ had already determined at Step 2 that Cote's disabilities were

not severe; that is, she was not *per se* disabled.  *Mables*, 812 F. Supp. at 891.  But this did not

end the inquiry.  At Step 6, the ALJ found that Cote suffered from a severe impairment, just not

to the severity of a *per se* disability.  The finding that she suffered from a severe impairment thus

required the ALJ to then proceed to Steps 7 and 8 which work in conjunction with one another.[3]

Step 8 is designed to determine whether a severely impaired individual may yet obtain

gainful employment.  First, the ALJ determines Cote's residual functional capacity.  *See* 20

C.F.R. § 404.1594(f)(7).  Residual Functional Capacity ("RFC") is defined as the most that an

individual can still do after considering the effects of physical and/or mental limitations that

---

[3]      Step 7 assesses a claimant's RFC to her past work while Step 8 focuses on RFC to
other work in general. *See* 20 C.F.R. § 404.1594(f)(7) and § (f)(8).

effect the ability to perform work-related tasks. 20 C.F.R. § 404.1545. Then, the ALJ examines whether the claimant has sufficient RFC to perform her past work.

First, the ALJ examined Cote's RFC. The transcript of the hearing shows that the ALJ spent significant time questioning Cote about her activities and physical abilities. As discussed above, Cote testified that she was able to perform a multitude of tasks including cooking, dusting, going to the store for groceries, visiting friends, and going to church. (R. 43-48). Cote further testified that she had been a weekly bowler in a local league, quitting only in the past year. (R. 49). Finally, Cote testified that she was able to drive short distances, sometimes to the store, and did so even after her doctor cautioned against it. (R. 44-45).

Based on this testimony and other record evidence, the ALJ found that Cote possessed the ability to "lift and carry (or push/pull) at least 10 pounds frequently and up to 20 pounds occasionally and sit, stand, and walk at least 6 hours of an 8-hour workday." (R. 21). However, the ALJ restricted her work ability by finding that she must avoid working around heights and machinery. The ALJ also noted that stress was a factor in Cote's mental impairment, causing her to have difficulty concentrating and having the potential to increase her seizures. Thus, the ALJ limited her work to simple one or two step tasks. This is a reasonable assessment of Cote's capacity for work in view of the sufficient evidence in the record, including Cote's own testimony.

Nevertheless, Cote insists that the ALJ did not properly consider her mental impairments when assessing her RFC and cites *Rohan v. Chater*, 98 F. 3d 966 (7th Cir. 1996), in support. However, *Rohan* is clearly distinguishable from Cote's situation. In *Rohan*, the plaintiff visited a psychiatrist after suffering symptoms of depression. The doctor diagnosed the plaintiff with major depressive disorder, ordered objective tests, and prescribed medication. Nevertheless,

- 19 -

"without expressly relying on any medical evidence or authority, the ALJ determined that [plaintiff's] efforts at engaging in a small machine repair/resale business were incompatible with a diagnosis of major depression and [the psychiatrist's] conclusions regarding [plaintiff's] functional abilities." *Id*. at 972.  In reversing, the Seventh Circuit expressly held that there was no evidence in the record to support the ALJ's finding other than his own lay opinions regarding depression.  *Id*. at 971.

In contrast, the ALJ in this case did not rely solely on his lay opinion regarding depression and/or anxiety.  Instead, in determining her RFC, the ALJ was assisted by the opinions of the two consulting psychiatrists who noted that Cote's impairments were not severe and that she was not significantly restricted in her daily life.   Further, unlike the *Rohan* plaintiff, Cote, herself, was uninterested in obtaining additional psychiatric care.   Indeed, Cote's own records from Tri-City reveal that she was able to function on a day-to-day basis and was even capable of caring for her elderly father – declining treatment beyond the counseling that she thought would entitle her to continued benefits.  Thus, contrary to Cote's claim, the ALJ did consider her mental condition in arriving at her RFC.

Based on her RFC and her lack of relevant work experience, the ALJ determined whether there was any work that Cote could perform.  The ALJ properly recognized that at Step 8, the burden shifts to the SSA to establish that there are other jobs existing in significant numbers in the national economy that the claimant can perform.  (R. 21).   The ALJ gave considerable weight to the testimony of the vocational expert indicating that there were a substantial number of jobs available for someone with Cote's RFC and of her age and education.   We see no reason to second guess the vocational expert's testimony nor to question the ALJ's proper reliance thereupon.

Accordingly, we find that the ALJ's application of the 8-step continuing disability analysis was proper and that his conclusions were supported by substantial evidence

C.      **The ALJ's Credibility Assessment of Cote Was Not Erroneous.**

Nevertheless, Cote urges the Court to reevaluate the ALJ's decision in light of allegedly erroneous credibility determinations.  Specifically, Cote contends the ALJ did not clearly state his reasons for finding her testimony "not totally credible."  (R. 23).  As the Seventh Circuit has recently stated, a reviewing court must determine whether an adverse credibility finding was supported by the record, recognizing that "the credibility determinations of an ALJ are entitled to special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).  This is because the ALJ is in the best position to hear and see the witness and assesses there forthrightness.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). This is not to say that an ALJ can merely deem a witness "incredible."  Rather, as *Golembiewski v. Barnhart*, 322 F.3d 912, (7th Cir. 2003) holds, the ALJ must "*specify* the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Id.* at 916 (emphasis in original). That is precisely what the ALJ did here. A review of the record evidence shows substantial evidence, as specifically articulated by the ALJ in his decision, that supports the ALJ's assessment of Cote.

In his decision, the ALJ specifically stated two reasons for doubting the credibility of Cote's testimony.  The ALJ first stated, "Although I find the claimant to have provided generally credible testimony, I find that she has a poor memory when it comes to recalling her seizure activity." (R. 19).  This conclusion is reasonable and with adequate support in light of the fact that Cote was unable to clearly recall the date of her last seizure when questioned by the ALJ at the hearing.  This is also supported by the fact that the progress notes of Dr. Ahmad show that

- 21 -

Cote was repeatedly reporting no seizure activity over a several year period of time yet she testified at the hearing that her "seizures were getting worse" since 1982 , and that she has them when she wakes up in the morning. (R. 37).

Next, the ALJ found that "her mental condition does not seem to be very serious, given the fact that she is taking care of a sick relative and apparently sought mental health treatment at Tri-City in order to continue receiving disability benefits.  Thus, I find that there is a gap in the claimant's credibility with respect to her ability to perform work-related tasks."  (R. 21).  This conclusion is well supported in the records from Tri-City where the social worker concluded that Ms. Cote was "coming to therapy as a means to get Social Security Disability benefits reinstated." (R. 352; *see also* R. 357, 364).  As the ALJ has stated specific reasons for his assessment of Cote's credibility, this court will not second guess his findings.

**D.     The ALJ Properly Classified Cote As An "Individual Closely Approaching Advanced Age."**

Finally, Cote argues that the ALJ failed to perform a borderline age determination. Essentially, she asserts that the ALJ did not consider her age, 53 at the time of his decision, to be a significant factor when assessing her ability to do work.

Age is an important factor when determining whether a person is entitled to continuing disability benefits.  Age as a factor should enter into the analysis when determining an individual's RFC and ability to learn or adapt to new work.  The provision promulgated by the SSA that discusses age as a factor in determining a claimant's ability to do work is 20 C.F.R. § 404.1563.  In this provision, there are three age categories specifically outlined.  These categories are as follows:

> (c)     Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.  However, in some circumstances, we consider that person age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.
>
> (d)     Person closely approaching advanced age.  If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.
>
> (e)     Person of advanced age.  We consider that at advanced age (age 55 or older) age significantly affects a person's ability to adjust to other work. We have special rules for persons of advanced age and for persons in this category who are closely approaching retirement age (age 60-64).

20 C.F.R. § 404.1563(c)-(e).

As Cote was 53 at the time of the hearing and the ALJ's decision, it is clear that she fits squarely within category defining "person(s) closely approaching advanced age."  Cote, nevertheless, argues that she should be considered a "person of advanced age."  She apparently

- 23 -

bases her argument on the statement contained in 20 C.F.R. § 404.1563(b), which states "we will not apply the age categories mechanically in a borderline situation." However, the regulation continues, stating "[i]f you are a *few days to a few months* of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluation the overall impact of all the factors of your case." 20 C.F.R. § 404.1563(b) (emphasis added). Here, Cote was more than one year away from reaching the older age category. As such, the ALJ correctly found that Cote was a "person closely approaching advanced age." He further relied on Cote's age in his hypothetical he posed to the VE to determine Cote's ability to do work. Because the ALJ properly assessed and relied on Cote's age in making his decision, we will not overturn his findings.

**E.  Cote Has Not Identified Any Errors of Law Justifying Remand**

Finally, Cote asserts that, in the alternative, she is entitled to remand because the ALJ committed errors of law. Cote does not identify any specific error of law independent of her arguments discussed above. Because we find that the ALJ's decision was supported by substantial evidence and that he applied the proper standards in his analysis, Cote's request for remand is DENIED.

### III.  CONCLUSION

Based on the foregoing, the decision of the ALJ is hereby **AFFIRMED.**

**SO ORDERED.**

ENTERED: June 23, 2005

S/ Philip P. Simon
PHILIP P. SIMON, JUDGE

- 24 -

UNITED STATES DISTRICT COURT